```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA       :      CRIMINAL ACTION
                               :
         v.                    :
                               :
ARDARRIUS WILLIAMS             :      NO. 12-100
```

MEMORANDUM

Bartle, J.                                              August 17, 2012

Defendant Ardarrius Williams is charged with possession with intent to distribute marijuana, possession of a firearm in furtherance of a drug trafficking crime, being a felon in possession of a firearm, and aiding and abetting.  See 18 U.S.C. §§ 2, 922(g)(1), 924(c); 21 U.S.C. §§ 841(a)(1).  Before the court is the motion of defendant to suppress physical evidence allegedly obtained in violation of the Fourth Amendment.[1]

The court held a hearing to hear evidence on the motion.  At the hearing, the government presented the testimony of Lancaster County Police Detectives Roland Breault, Manuel Luciano, Jason Drouillard, Jeffrey Bell, and Michael Gerace as well as Police Officer Thomas Cole.  Defendant offered the testimony of his wife, Wanda Williams and of Peggy Null, the property manager of the Williams's residence.  Photographs and other exhibits were introduced without objection.

---

1.  Defendant has also filed a motion to suppress statements he made after his arrest.  At the hearing, the government stated that it does not intend to introduce as evidence these statements.  Accordingly, that motion will be denied as moot.

The testimony presented establishes that, on December 7, 2011 at approximately 11:55 p.m., police officers came to the Williams's home located at 422 Reynolds Avenue in Lancaster, Pennsylvania in response to a radio call reporting a shooting at that address. When police arrived, they observed that the front door of the home had been removed from its hinges and contained a bullet hole. There was blood on the door and porch and blood trails leading into the residence. The officers conducted a protective sweep of the property and determined that the home was empty. They learned from a neighbor that the shooting victim had been transported to Lancaster General Hospital.

Officers Breault and Luciano arrived at the hospital at approximately 12:30 a.m on December 8. They determined that defendant was the victim of a shooting and that he was receiving medical treatment. Breault and Luciano then went to speak with Wanda Williams, who was waiting with her children in the chaplain's room in the hospital. At Breault's request, Ms. Williams agreed to accompany him and Luciano to the police station to discuss her husband's shooting. Breault and Luciano drove Ms. Williams the short distance in an unmarked police vehicle. Before leaving, Ms. Williams made arrangements for her mother to care for her two children.

Breault and Luciano brought Ms. Williams to an interview room. According to Breault, she seemed distracted but did not hesitate to accompany them to the station. He testified that he did not make any threats or promises to entice her to do

so.  Once at the station, Breault stated that he informed Ms. Williams that police wanted to process the scene of the shooting.  He presented Ms. Williams with a form labeled "consent search."  Breault stated that he explained the consent form and told her that the search would involve places in the house where blood was found and other areas where evidence could be located.  They did not question Ms. Williams regarding the case at that time.  According to Breault and Luciano, Ms. Williams seemed alert and did not indicate that she did not understand the form.  Both Breault and Luciano related that they made no promises or threats to induce her to sign.

At approximately 1:00 a.m., Ms. Williams signed the one-page consent form.  It named the place to be searched as: "<u>residence/422 Reynolds Ave. Lancaster PA</u>" and stated in bold that the items to be searched for included:

> Photographs to be taken of any located items such as; any weapon(s) (ex. handguns, ammunition, gun case, gun clip, casings, gun related accessories), cell phones, clothing (hats), blood, trace evidence and any other items related to a shooting at 422 Reynolds Ave. Lancaster, PA and said items to be collected in addition to being photographed.

The form further provided:

> I was informed by the above listed officer that under the Fourth Amendment of the United States Constitution and Article I section 8 of the Pennsylvania Constitution, the above listed location(s) could be searched only on th authority of a search warrant issued by a Judge or District Justice, and that a search warrant would be issued by a Judge, or District Justice, only where there were sufficient facts presented to him/her, under oath or affirmation, that

> would lead to a reasonable belief that the below listed item(s) where [sic] in the above listed location(s). I was advised that I did not have to agree or consent to this search, and that I could absolutely refuse to consent to this search.
>
> I hereby freely, voluntarily and knowingly waive my rights under the Fourth Amendment of the United States Constitution and Article I section 8 of the Pennsylvania Constitution....
>
> No threats, promises or representations of any kind have been made to me by this or any other officer.

Breault testified that it was not until thereafter that Ms. Williams was questioned about her husband's shooting.

At the hearing, Ms. Williams conceded that she went to the police station voluntarily, although she stated that she felt tired, afraid, and confused during her encounter with the police. Ms. Williams testified that she did not have her glasses, which she needs to see distances.[2] She further stated that police told her she needed to consent to the search immediately because it was raining. Ms. Williams also claims that the officers stated they would be unable to apprehend the individual who shot her husband without her consent to the search. From what the officers said, she believed that the search would be limited to "blood samples" and "fingerprints." According to her, the

---

2. Ms. Williams also testified that she needs her glasses for "everything" but did not state that she could not read the consent form without them. We note that she was able to drive her husband to the hospital that night without her glasses and also able to sign her name clearly on the signature line on the consent form.

officers did not explain the consent form, and she did not have an opportunity to review it.[3] Nonetheless, she admits that she did in fact sign the consent form and that no threats were made to induce her to do so.

Upon being notified of Ms. Williams's consent, Drouillard, Bell, and Cole traveled to the home and began a search.  They followed a blood trail through the kitchen and up to and on the basement door.  The blood did not proceed down the stairwell.  The officers entered the basement and observed in plain view a rifle scope, several smoked marijuana cigarettes, and a marijuana pipe.  They also saw what appeared to be a black gun case, in which Officer Cole, who was familiar with firearms and firearms cases, found a semi-automatic weapon.  Stacks of cardboard boxes were present which smelled of marijuana.  Upon viewing these items, the officers terminated the search and applied for a search warrant, which was issued.  They later applied for a second search warrant, which was also approved.  The search ultimately yielded over 30 pounds of marijuana, numerous items of drug paraphernalia, 3 firearms, a small safe, a laptop computer, a hat, a cellular telephone, and $14,989.

---

3.  In his brief in support of the motion to suppress, defendant asserts that the officers informed Ms. Williams that if she did not consent to the search, she would be arrested and lose her house, job, and custody of her two children.  These type of threats would certainly negate the voluntariness of her consent.  See United States v. Santos, 340 F. Supp. 2d 527, 538-89 (D.N.J. 2004).  However, Ms. Williams did not testify as to any of these threats at the hearing and therefore the court will not consider these allegations.

Defendant argues that the narcotics and weapons must be suppressed because they are products of an illegal, warrantless search. The Fourth Amendment provides that, "the right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated." U.S. Const. amend. IV. Searches and seizures conducted without a warrant are per se unreasonable under the Fourth Amendment unless they fall within a few specifically established exceptions to the warrant requirement. See Thompson v. Louisiana, 469 U.S. 17, 19-20 (1984).

The government relies on the exception that police officers may conduct a warrantless search if an occupant of the home voluntarily consents to the search.[4] See Georgia v. Randolph, 547 U.S. 103, 109 (2006); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). An occupant is an individual who possesses common authority over the property, or whom the police reasonably yet mistakenly believe has such authority. Randolph, 547 U.S. at 109. Defendant does not dispute that Ms. Williams, as his wife and co-tenant, possessed the authority to consent to a search in his absence. See id.

To justify a search based on consent, the Government "has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). This court must consider the totality of the

---

4. The government does not argue that exigent circumstances justified the search. See, e.g., United States v. Wolfe, 452 F. App'x 180, 183 (3d Cir. 2011).

circumstances surrounding Ms. Williams's consent, including her age, education, and intelligence; whether she was advised of her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of any physical punishment.  See United States v. Price, 558 F.3d 270, 278 (3d Cir. 2009).  We must also consider "'the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions.'"  Id. (quoting United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003)).

Ms. Williams is an adult woman who is fluent in the English language and who did not appear to be wanting in intelligence.  While the parties did not introduce evidence of her education, she testified that she had been employed for 11 years in the clerk's office of the Court of Common Pleas of Lancaster County.  The length of time between when officers first approached Ms. Williams and the time when she signed the consent form was less than one hour.  She was not arrested or handcuffed before she gave consent.  The officers did not show their weapons and did not use any form of threat or physical punishment.

As discussed above, Ms. Williams asserts that she was not advised of the true nature of the search.  She testified that she believed that any search would be limited to finding "blood samples" and "fingerprints" in order to apprehend the individual who shot her husband.  Ms. Williams further stated that she would not have consented to the search if she had known that police

intended to look for guns and other evidence.  Yet she also testified that she believed she "had nothing to hide."

At the time that she gave consent, Ms. Williams was understandably tired and preoccupied with thoughts regarding her husband's health.  Although she recounted that the officers accused her of lying in response to questions regarding her husband's shooting and told her that she was in "trouble" because police had found incriminating items in the house, she admits that such questioning occurred after she had already signed the consent form.

The consent form which Ms. Williams executed was a one-page document and was written clearly.  It informed Ms. Williams of her right to withhold consent and identified the area to be searched as the "<u>residence/422 Reynolds Ave. Lancaster PA</u>."  It further stated in bold that the items to be searched for included not only blood but also guns, ammunition, and gun-related evidence.  To the extent that the testimony of the police officers conflict with that of Ms. Williams, we believe the police officers.  Under the totality of the circumstances, we find that Ms. Williams's consent was voluntary and therefore valid.

Defendant also asserts that the search of the basement exceeded the scope of the consent given by his wife.  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange

-8-

between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991).  Furthermore, "[t]he scope of a search is generally defined by its expressed object." Id.

Here, the consent form which Ms. Williams signed clearly stated that the scope of the search was the "residence" and did not restrict the search to specific areas of the house. Evidence admitted at the hearing showed blood not only at the entrance of the house but also in the kitchen and living room of the residence as well as on the wall leading up the stairwell to the second floor and on the basement door.  The items identified in the consent form clearly could have been found in nearly any area of the house, including the basement.  Ms. Williams concedes that she did not tell Breault and Luciano that her consent was limited in any manner.  Accordingly, we conclude that the search of the residence did not exceed the scope of Ms. Williams's consent.

Since the government had Ms. Williams's voluntary consent to search the entire house, they were properly in the basement where they saw the contraband in plain view.  See Horton v. California, 496 U.S. 128, 134-37 (1990).  What they observed provided the proper basis for the subsequent search warrants which resulted in the seizure of the evidence which defendant seeks to suppress.

Accordingly, the motion of defendant to suppress physical evidence will be denied.